UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ROBERT DEREK LURCH, JR.,

                                    Plaintiff,

            -against-

MD FRANCE CHAPUT, RN MARIA
MARQUEZ,

                                    Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:   3/25/2022

16 Civ. 2517 (AT)

**ORDER**

ANALISA TORRES, District Judge:

Plaintiff *pro* se, Robert Derek Lurch, Jr., brings this action pursuant to 42 U.S.C. § 1983,

alleging violations of his Fourth and Fourteenth Amendment rights, stemming from an

involuntary hospitalization and administration of antipsychotic drugs at Bellevue Hospital on

December 26, 2013. *See* Third Am. Compl., ECF No. 57. Defendants France Chaput, M.D. and

Maria Marquez, R.N. move for summary judgment pursuant to Federal Rule of Civil

Procedure 56. Defs. Mot., ECF No. 257. For the reasons stated below, Defendants' motion is

GRANTED.

**BACKGROUND[1]**

Lurch has a history of mental illness and substance abuse, including past diagnoses for

intermittent explosive disorder and bipolar disorder. Lurch Tr. at 37, 54, 57, ECF No. 257-6. As

---

[1] The Court considers admitted for purposes of the motion any paragraph that is not specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party. Local Civ. R. 56.1(c). And, "[e]ach statement by the . . . opponent . . . including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)." *Id.* at 56.1(d). Lurch has failed to comply with Rule 56.1 by both failing to submit his own counter-statement of material facts, and by disputing Defendants' assertions without citing admissible evidence. *See* Pl. 56.1, ECF No. 276. A district court has "broad discretion to determine whether to overlook a party's failure to comply with local court rules" and may "opt to conduct an assiduous review of the record." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (citations and quotation marks omitted). The Court shall conduct such a review here. However, when "objections are unsupported by the record, they are conclusory and cannot create a genuine dispute of material fact." *Mortimer v. Wilson*, No. 15 Civ. 7186, 2020 WL 3791892, at *6 (S.D.N.Y. July

early as fourteen, Lurch "was drinking entire bottles of liquor." *Id.* at 120. On December 26, 2013, Lurch attended a friend's birthday party, where he consumed at least six to eight shots of vodka, or a quarter of a 750ml bottle. Defs. 56.1 ¶¶ 17–18, ECF No. 257-13; Lurch Tr. at 122. While Lurch was "[working] through the next quarter," his friends told him to "get something to eat." Lurch Tr. at 122–23; Defs. 56.1 ¶ 18. He then went to a Chinese restaurant on 24th Street in Manhattan. Lurch Tr. at 125. After ordering, Lurch believed he had been given an incorrect amount of change, and began arguing with the restaurant's cashier. *Id.* at 130–31. The cashier then called 911. *Id*. at 131.

New York City Police Department ("NYPD") dispatch records indicate that at approximately 8:15 p.m., the "perp," (understood to be Lurch) was "getting out of control . . . inside [a] Chinese rest[aurant]," was "trying to break [a] computer," and was "very violent [and] throwing things around the restaurant." ECF No. 257-9 at 2, 8. When NYPD officers arrived at the restaurant, they twice instructed Lurch to leave. Lurch Tr. at 146, 151. Lurch refused. *Id.* at 147. The police then forced him to leave, handcuffed him, and put him into an ambulance, *id.* at 160–61, where he was evaluated by Joseph Piergiovanni and Nicole Pucciarelli, both emergency medical technicians (the "EMTs"), *see* Medical Records at 19–21, ECF No. 257-10; *see also* Pucciarelli Tr. ECF No. 257-5, at 56–60. Pucciarelli filled out a prehospital care report (the "PCR") while transporting Lurch to Bellevue Hospital. Pucciarelli Tr. at 46–53; *see also* Medical Records at 19–21. The PCR characterizes Lurch as an "EDP" or "emotionally disturbed person." Medical Records at 19; *see also* Pucciarelli Tr. at 62–63. At her deposition, Pucciarelli stated that this designation is applied based on multiple criteria, including the patient's presentation and behavior, and whether the patient discloses any prior

---

7, 2020). Therefore, the Court will rely only on those statements that are free from these defects and supported by admissible evidence in the record. *See id.*

psychiatric history, *id.* at 65–66.  Piergiovanni similarly explained that the EDP designation is applied to "[a]nybody trying to harm themselves or others."  Piergiovanni Tr., ECF No. 257-5 at 19.  The PCR indicates that, upon the EMTs' arrival, the police "complained [that Lurch] . . . was combative with Chinese restaurant staff . . . and causing destruction" at the restaurant. Medical Records at 20.

Although Lurch claims that the EMTs did not ask him about any known allergies, Lurch Tr. at 162–63, Pucciarelli stated that it is her custom and practice to ask patients about allergies to food and medication and to document and report any allergies to medical staff.  *See* Pucciarelli Tr. at 86–89, 125–26, 128; *see also* Piergiovanni Tr. at 16–17.  Pucciarelli testified that she had "[no] doubt" she did so here.  Pucciarelli Tr. at 96.  In the PCR, Pucciarelli wrote "NKDA," Medical Records at 19, which stands for "no known diagnosed allergies," Piergiovanni Tr. at 17. Pucciarelli explained that "per the [PCR]," this means that Lurch denied having medical allergies.  Pucciarelli Tr. at 96–99.  Pucciarelli and Piergiovanni then took Lurch to Bellevue Hospital, the nearest facility, for further evaluation and treatment, *see* Defs. 56.1 ¶ 23; Pucciarelli Tr. at 62.

At 8:59 p.m., Kazumi Inose, R.N., the triage nurse, entered a note stating that Lurch was brought into the emergency department "in handcuffs," that he was "agitated," with "no medical complain[ts]," and had "no known drug allergies."  Medical Records at 31.  Inose recommended that Lurch be "sent for [p]sychiatric evaluation and/or clearance."  *Id.*  Lurch was then transferred to the hospital's Comprehensive Psychiatric Emergency Program (the "CPEP"), where Defendant France Chaput, M.D., a psychiatrist, was the attending physician.  Chaput Aff. ¶ 10, ECF No. 257-11.  It is Chaput's custom and practice to familiarize herself with the information set forth in a patient's PCR by either reviewing the document or speaking with the

EMTs that had completed it.  *Id*. ¶ 9.  Chaput's signature appears on the PCR.  *See* Medical Records at 21.

At intake, the NYPD officer accompanying Lurch told Chaput that Lurch had been "breaking things," and asked Chaput to give Lurch "something to calm him down" because he was "acting out."  Defs. 56.1 ¶ 22.  At 9:14 p.m., Chaput entered an initial treatment note, describing Lurch as a "23 [year old] . . . with unknown psychiatric hx," and stating that he was brought in by the EMTs "after he became disruptive in a Chinese restaurant, did not pay for his food and started breaking things."  Medical Records at 40.  Chaput documented that "at arrival," Lurch was "agitated, threatening NYPD . . . and unable to cooperate."  *Id.*; *see also* Chaput Aff. ¶ 11.  Chaput also stated that, in her training and experience, when a patient like Lurch is "in handcuffs, but not under arrest," it is because the accompanying police officers "thought he posed a substantial risk of harm to himself or others."  Chaput Aff. ¶ 8.  Chaput "attempted to redirect . . . Lurch and employ less restrictive measures," but Lurch was "unable to cooperate with respect to a psychiatric evaluation."  *Id.*  ¶¶ 11, 12; *see also* Medical Records at 2.

Chaput concluded that because Lurch "posed an imminent threat of serious harm," her team would need to sedate and restrain him before the NYPD removed his police handcuffs.  Chaput Aff. ¶¶ 12–15.  Chaput then completed a restraint order form which documented that at 9:10 p.m., she had conducted a "face to face" evaluation of Lurch, and ordered wrist and ankle restraints for him for a period of two hours, on the ground that Lurch posed an "imminent danger to others."  Medical Records at 2.  Chaput characterized Lurch as "agitated, threatening, [and] unable to cooperate."  *Id*.  The form was also signed by a nurse, Belen Clemente, R.N., who listed the "less restrictive measures used prior to restraint," including asking Lurch to stay calm,

redirecting Lurch from the "focus of [his] anger," and increasing observation. *Id.*; *see also* Chaput Aff. ¶ 12.

Chaput also determined that because Lurch was "completely uncooperative," and posed a "substantial and imminent risk for serious physical harm to himself and/or others" based on his behavior, he should be sedated, and that intramuscular, rather than an oral, medication was the "most appropriate, reasonably available means of reducing the danger" he posed.  Chaput Aff. ¶¶ 15–16.  Defendant Maria Marquez, R.N., a nurse, similarly documented in a treatment note that Lurch was "agitated and threatening staff[,] combative[,] yelling and cursing and not amenable with redirection" prior to the administration of the sedatives.  Medical Records at 37. Marquez assessed and documented Lurch's behavior under the Broset Violence Checklist, noting that Lurch exhibited irritability and boisterousness, and was physically and verbally threatening. *Id.* at 36.  Marquez categorized Lurch's risk level as at an "imminent risk of violence."  *Id.*  On this basis, Marquez concluded that Lurch was a "danger to others," as evidenced by his "severely agitated behavior, [and his being] loud and verbally abusive and not amenable with redirection." *Id.* at 38.  And, Clemente documented Lurch's condition at approximately fifteen-minute intervals.  *See* Medical Records at 3.  At 9:10 p.m., 9:15 p.m., and 9:30 p.m., Clemente entered notes indicating that Lurch was "aggressive/angry," "agitated/combative," and "alert."  *Id.*; *see also* Chaput Aff. ¶ 17.

Accordingly, in her 9:14 p.m. treatment note, Chaput ordered that Lurch be given an intramuscular injection of 5 mg of Haloperidol Lactate (commonly known as Haldol) and 2 mg

of Lorazepam or Ativan.  Medical Records at 32–33.  At Chaput's direction, Marquez administered the Haldol to Lurch.  *Id.*; Chaput Aff. ¶ 17.

At 9:35 p.m., Chaput conducted another evaluation of Lurch, noting that because Lurch was "now sedated," he could not be interviewed.  *Id.* at 42; Chaput Tr. at 158–60, ECF No. 257-7.  At 9:41 p.m., Chaput "entered a more comprehensive note" in Lurch's chart, stating that Lurch "manifested hostile and agitated behavior, impaired impulse control and impaired judgment."  Chaput Aff. ¶ 20; *see* Medical Records at 43.  Chaput further diagnosed Lurch with substance related disorder, psychotic disorder, and mood disorder, and described him as "at acute risk of harm to others given recent violence, agitation at arrival in CPEP."  Medical Records at 43; Chaput Aff. ¶ 20.  Because Lurch was classified as a "violence risk," Chaput directed that Lurch be observed every fifteen minutes, and ordered "assault precautions," and if needed, medication for agitation.  Chaput Aff. ¶ 19; Medical Records at 43.  Finally, Chaput ordered that Lurch be "placed on hold for safety" and "re-assess[ed] when he is able to cooperate."  Medical Records at 43.

Lurch disputes the characterization of his behavior, stating that he was "calm, cool and collected" at Bellevue.  Lurch Tr. at 192.  He admits, however, that after he arrived there he called a male police officer a "bitch" in the doctors' presence, *id.* at 164–66; Defs. 56.1 ¶ 22.  Lurch also states that he told "the admitting psyche" not to give him Haldol, because he is allergic to the drug.  Lurch Tr. at 167–70.  Lurch states he was not restrained at the time, but the staff had to "hold [him] physically" because he was "combative."  *Id.* at 175.  Lurch asserts that he was held down by the hospital staff, and forcibly administered Haldol by a "Spanish looking nurse."  *Id.* at 191.  Lurch "passed out," but could not recall if this was "before" or "as soon as" the "needle . . hit . . . [his] skin."  *Id.* at 173.  Other than "passing out," Lurch did not recall any

adverse reactions to the Haldol.  *See id.* at 177, 182.  Chaput stated that "[a]t no time did [Lurch]

have any adverse allergic reaction or . . . side effect to Haldol[,] or report to anyone upon his

arrival to CPEP that he was allergic to Haldol," Chaput Aff. ¶ 21, and no adverse reactions were

documented in Lurch's medical records, *see* Medical Records at 53.

      At 9:45 p.m. Clemente documented Lurch as "asleep" and "calm," and noted that his

restraints were discontinued.  Medical Records at 3–4.  Clemente justified the restraints,

characterizing Lurch as previously "agitated" and "menacing/threatening."  *Id.* at 4.  She also

indicated that the assistance of hospital police was required to deescalate the situation.  *Id.*  At

4:54 a.m. on December 27, 2013, a status note by Elma De la Cruz, R.N., stated that Lurch "has

been asleep since [9:45 p.m.] after he was released from wrist and ankle restraint[s]," that Lurch

was "[i]n no apparent distress," and that his vital signs were being "checked and monitored

closely."  *Id.* at 47.  At 12:00 p.m., Jennifer Halper, M.D., another attending psychiatrist, entered

a "CPEP Disposition Note," based on her evaluation of Lurch that morning.  *Id.* at 52, 54.  She

indicated that Lurch described the altercation at the Chinese restaurant to her, and that Lurch

"state[d] he was agitated [at Bellevue] because the cuffs [administered by the NYPD] were too

tight but minimize[d] the extent of it."  *Id.* at 52.  Lurch also acknowledged to Halper that he had

drunk a bottle of liquor during a friend's birthday party the night before.  *Id.*  Halper noted that

Lurch had a history of "hospitalizations and ED visits for anger issues," but that Lurch "state[d]

he has since learned how to better control his anger."  *Id.* at 52.  Finally, Halper wrote that Lurch

"state[d] Haldol leads to trouble breathing but notably no reaction occurred last night."  *Id.* at

52–53.

      Lurch "forgot this event even happened" until, while incarcerated at Rikers several

months later, he reviewed his hospital records from the night in question in preparation for

defending himself against unrelated criminal charges. Lurch Tr. at 133. Upon review, Lurch realized he had been given Haldol, and stated he "would have never even remembered this incident" had he not reviewed those records. *Id.* at 134–36.

On April 5, 2016, Lurch commenced this action, naming the City of New York (the "City"), the New York City Health and Hospitals Corporation ("HHC"), and several NYPD police officers as defendants, in addition to Chaput and Marquez. ECF No. 2. On June 28, 2017, the Court dismissed Lurch's claims against the City and HHC. ECF No. 82. On November 2, 2018, the Court dismissed Lurch's claims against the police officers. ECF No. 166. Chaput and Marquez now move for summary judgment on Lurch's remaining claims. Defs. Mot., ECF No. 257.

**DISCUSSION**

I.   <u>Legal Standard</u>

    A.   Summary Judgment

Summary judgment is appropriate when the record shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247–48 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–26 (1986). A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The moving party initially bears the burden of informing the Court of the absence of a genuine dispute of material fact by citing particular evidence in the record. Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 323–24; *Koch v. Town of Brattleboro*, 287 F.3d 162, 165 (2d Cir. 2002). If the nonmoving party has the ultimate burden of proof on specific issues at trial, the movant may also satisfy its own summary judgment burden by demonstrating that the adverse party cannot

produce admissible evidence to support an issue of fact. *Celotex*, 477 U.S. at 322–23; *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam).

If the moving party meets its initial burden, the burden then shifts to the opposing party to establish a genuine dispute of material fact. *Beard v. Banks*, 548 U.S. 521, 529 (2006); *PepsiCo*, 315 F.3d at 105. In doing so, the non-moving party "may not rely on conclusory allegations or unsubstantiated speculation," *Scott v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) (citation omitted), as "unsupported allegations do not create a material issue of fact," *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (citation omitted). In deciding the motion, the Court views the record in the light most favorable to the nonmoving party. *Koch*, 287 F.3d at 165.

Where, as here, a litigant appears *pro se*, his submissions should be read liberally and interpreted "to raise the strongest arguments that they suggest." *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)). Nevertheless, proceeding *pro se* does not relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's "bald assertion, completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin*, 902 F. Supp. 424, 429 (S.D.N.Y.1995) (quotation marks omitted) (quoting *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

## B.  Section 1983

Section 1983 creates no substantive rights—it merely provides a "procedure for redress for the deprivation of rights established elsewhere." *Thomas v. Roach*, 165 F. 3d 137, 142 (2d Cir. 1999). To prevail on a claim under § 1983, a plaintiff must establish that (1) the defendants were acting under color of state law when they committed the acts at issue, and (2) that the

conduct complained of deprived the plaintiff of a right established by the Constitution or federal law. *West v. Atkins*, 487 U.S. 42, 48 (1988). Here, Defendants are employees of Bellevue Hospital, a facility operated by HHC, a municipal corporation. *Simpkins v. Bellevue Hosp.*, 832 F. Supp. 69, 73 (S.D.N.Y. 1993). Defendants do not dispute that they acted under color of state law. *See generally* Defs. Mem., ECF No. 259. The Court, therefore, only considers whether Defendants' conduct deprived Lurch of a right guaranteed to him by the Constitution or federal law.

II.   <u>Involuntary Commitment</u>

Lurch claims that Chaput violated his Fourth Amendment rights by involuntarily committing him to Bellevue. Third Am. Compl. at 29–38. Involuntary civil commitment gives rise to substantive and procedural due process claims under the Fourteenth Amendment, *Rodriguez v. City of New York*, 72 F.3d 1051, 1061–62 (2d Cir. 1995), and unreasonable search and seizure claims under the Fourth Amendment, *Glass v. Mayas*, 984 F.2d 55, 58 (2d Cir. 1993). Given the Court's duty to read Lurch's pleadings liberally and interpret them to "raise the strongest arguments they suggest," the Court considers his claims under both constitutional standards. *McPherson*, 174 F.3d at 280.

A.  Fourteenth Amendment Due Process

Involuntary civil commitment is a "massive curtailment of liberty" that "cannot permissibly be accomplished without due process of law." *Rodriguez*, 72 F.3d at 1061 (citation omitted). And, substantive due process "does not permit the involuntary hospitalization of a person who is not a danger either to h[imself] or to others." *Id.* Defendants argue that Chaput was justified in confining Lurch because Chaput complied with the state Mental Hygiene Law (the "MHL") and accepted standards of care. Defs. Mem. at 16.

In *Project Release v. Provost*, the Second Circuit "considered as a whole" New York's involuntary commitment statutory scheme, codified in the MHL, and held that it satisfies the constitutional minimum of due process—"both substantive and procedural."  722 F.2d 960, 971, 973 (2d Cir. 1983).  Thus, where a physician's decision to confine a patient comports with the MHL's provisions, the patient cannot prevail on a claim that the hospitalization violated either their substantive or procedural due process rights.  *See Fisk v. Letterman*, 501 F. Supp. 2d 505, 522–26 (S.D.N.Y. 2007).  Lurch was held at Bellevue pursuant to MHL § 9.40, Chaput Aff. ¶¶ 20, 25, which allows a qualified hospital to commit a person for observation for up to seventy-two hours if the patient has a mental illness "for which immediate observation, care, and treatment . . . is appropriate, and which is likely to result in serious harm to the person or others," N.Y. Mental Hyg. L. § 9.40(a).

### 1.   Substantive Due Process

Defendants first argue that Chaput had a "reasonable basis" to confine Lurch at Bellevue, because he presented with "symptoms indicative of a mental illness" and posed a serious, substantial risk of imminent harm.  Defs. Mem. at 16.  The MHL "implicitly defers to medical judgment," *Fisk*, 501 F. Supp. 2d at 522, and requires physicians "to make a medical decision, guided by standards that are generally accepted within the medical community," *Rodriguez*, 72 F.3d at 1062–63 (citation omitted).  This comports with the standard outlined by the Supreme Court in *Youngberg v. Romeo*, under which medical professionals may be held liable for substantive due process violations only when their medical decisions represent such a substantial departure from accepted professional judgment, practice, or standards that it demonstrates that they did not base their decision on such a judgment.  457 U.S. 307, 323 (1982).  A doctor's professional judgment is accorded a presumption of validity.  *Id.* at 324.  To rebut this

11

presumption and create a genuine dispute of material fact, Lurch "bears the burden of producing competent evidence, typically in the form of expert testimony, regarding applicable medical standards and the defendants' alleged failure to meet those standards." *Fisk*, 501 F. Supp. at 522; *see also Olivier v. Robert L. Yeager Mental Health Ctr.*, 398 F.3d 183, 190–91 (2d Cir. 2005) (finding that because a doctor's decision to "commit a person involuntarily . . . does not ordinarily involve matters within the layman's realm of knowledge," a determination as to whether an individual "is mentally ill and dangerous to either himself or others . . . turns on the *meaning* of the facts which typically must be interpreted by expert psychiatrists and psychologists." (citation and quotation marks omitted) (emphasis in original)).

The record demonstrates that Chaput had a sufficient basis to draw the conclusion that Lurch had a "mental illness . . . which is likely to result in serious harm to [Lurch] or others," requiring further observation and treatment, justifying Lurch's involuntary hospitalization under the MHL.  MHL § 9.40.  At intake, the EMTs and police officers on the scene represented to Chaput that Lurch "became disruptive" and "combative" at the restaurant, and was "causing destruction" and "breaking things."  Medical Records at 20–21; Defs. 56.1 ¶ 22.  A police officer asked Chaput to give Lurch something to "calm him down."  Defs. 56.1 ¶ 22.  Chaput documented that, at Bellevue, Lurch was "agitated, threatening NYPD . . . and unable to cooperate."  Medical Records at 32.  Although Lurch was not under arrest, he was handcuffed, which, in Chaput's professional experience, indicates that the accompanying police officers believed Lurch "posed a substantial risk of harm to himself and others."  Chaput Aff. ¶ 8.  Chaput and her team attempted to deescalate the situation by first employing less restrictive measures, which were unsuccessful.  *Id.* ¶¶ 11–12; Medical Records at 2.  Given Lurch's continued agitation and combative behavior, and the "imminent threat of serious harm" he posed,

Chaput determined that restraints and sedative medication were warranted before Lurch's police handcuffs could be removed, and ordered their administration.  Chaput Aff. ¶¶ 12–14; Medical Records at 2.

Chaput's testimony is supported by Lurch's medical records and contemporaneous documentation from medical professionals.  *Cf. Xiao Qing Liu v. New York State Dep't. of Health*, No. 16 Civ. 4046, 2017 WL 3393944, at *9 (S.D.N.Y. Aug. 7, 2017) (denying motion to dismiss plaintiff's involuntary commitment claim where contemporaneous medical records contradicted physicians' later testimony that plaintiff was psychotic and delusional).  At least three other nurses involved in Lurch's treatment characterized Lurch's behavior in a similar way: Inose, at triage, documented that Lurch was "agitated" and directed that he be sent for a psychiatric examination, Medical Records at 31; Marquez, applying the Broset Violence Checklist, categorized Lurch as at an "imminent risk of violence," and noted that he was "agitated and threatening staff[,] combative[,] yelling and cursing and not amenable with redirection," *id.* at 36–37; and Clemente, who observed Lurch while he was restrained, and characterized him as "agitated" and "menacing/threatening," *id* at 4.  Chaput ultimately diagnosed Lurch with three mental illnesses, including a substance related disorder, a psychotic disorder, and a mood disorder, and concluded he posed an "acute risk of harm to others," given his "recent violence" and "agitation at arrival."  *Id.* at 43; Chaput Aff. ¶ 20.  Courts in this Circuit have concluded that similar observations from a medical professional are sufficient to support a finding that a patient poses a danger to himself or others, and thus, that their involuntary hospitalization comports with substantive due process.  *E.g.*, *Drozdik v. City of New York*, No. 01 Civ. 3300, 2003 WL 366639, at *3 (S.D.N.Y. Feb. 20, 2003) (collecting cases), *report and recommendation adopted*, No. 01 Civ. 3300, ECF No. 27.

Chaput also submits the expert testimony of Steven Fayer, M.D., an attending psychiatrist at the Mount Sinai Hospital, who, based on his review of the record in this matter, concludes that the treatment administered by Defendants comported with "the standard of care in all respects." Fayer Decl. ¶¶ 1, 4, ECF No. 257-12.  He opines that Chaput "acted properly by holding [Lurch] for observation," given that Chaput was "specifically advised by the police department and EMS that [Lurch] had recently engaged in violent, combative, and destructive behavior," and because Lurch "verbally abus[ed] a police officer in [Chaput's] presence[.]"  *Id.*  ¶ 22.  Fayer additionally notes that Lurch's blood alcohol content of .26%, or three times the legal limit, "in . . . itself posed an appreciable risk of harm to himself and others" on the night in question, and it was "reasonable, even necessary," for Chaput to hold and observe him at the hospital given the extent of his inebriation.  *Id.* ¶¶ 12, 23.

Lurch argues that Chaput "made baseless findings" because she "never described the actual event or conduct that led to her making these findings."  Pl. Opp'n. at 4, ECF No. 277.  But, Chaput clearly set forth the basis for her conclusions in her notes—she cites both Lurch's destructive, disruptive behavior at the restaurant, as well as his "agitated" and "threatening" behavior at the hospital.  Medical Records at 32.  Although Lurch repeats "his belief that he was not dangerous . . . [he] has not offered any medical evidence or expert testimony to rebut the findings of the . . . doctors who concluded that [he] . . . was a danger."  *Mawhirt v. Ahmed*, 86 F. Supp. 2d 81, 89–90 (E.D.N.Y. 2000), *judgment vacated in part on other grounds*, 8 F. App'x 235 (2d Cir. 2001).[2]  Moreover, the Court cannot credit Lurch's representation that he was "not a

---

[2] On July 21, 2017, the Court appointed Lurch limited counsel for the purpose of conducting discovery; enabling him to conduct depositions and take expert testimony in support of his case.  ECF No. 85.  Lurch's counsel represented him until the close of fact and expert discovery, and conducted depositions of Chaput, Halper, EMTs Joseph Piergiovanni and Nicole Pucciarelli, and defended the deposition of Lurch's expert, Lama Bazzi, M.D.  *See* ECF No. 214-2.  Lurch, therefore, had a full opportunity to substantiate his allegations with competent evidence.  Lurch did not submit Bazzi's expert testimony in connection with his opposition papers, or provide any other expert testimony or evidence to support his claims.

danger to himself or others," Pl. Opp'n at 4, when, in deposition testimony, Lurch concedes that he called an NYPD officer a "bitch" in the doctors' presence,[3] that he was "combative" at the hospital, and that the staff had to "hold [him] down," all of which are consistent with Chaput's contemporaneous records of Lurch's behavior.  Lurch Tr. at 164–66, 175.  Although the Court cannot resolve issues of credibility on summary judgment, Lurch's "self-serving, incomplete, and inconsistent recollection is not sufficient to create a genuine dispute of fact in light of [Defendants'] documented evidence."  *Lozada v. Delta Airlines, Inc.*, No. 13 Civ. 7388, 2014 WL 2738529, at *5 (S.D.N.Y. June 17, 2014).  The Court finds, therefore, that Chaput reasonably believed Lurch posed a risk of harm to himself or others, and thus, his involuntary hospitalization comported with substantive due process.  *Anthony v. City of New York*, 339 F.3d 129, 142 (2d Cir. 2003) (finding no substantive due process violation from involuntary confinement where hospital staff reasonably believed plaintiff was a danger to herself or others).[4]

### 2.   Procedural Due Process

A patient held involuntarily under MHL § 9.40 must be examined by a staff physician "within six hours after the person is received into the program's emergency room," and "may be retained for observation, care, and treatment and further examination for up to twenty-four

---

[3] Lurch appears to argue that Defendants cannot cite his admission of verbal abuse to justify their actions, because it is "protected speech and it cannot be used as a verbal abuse finding." Pl. Opp'n. at 2.  But, Lurch does not cite any authority or basis for why the Court should consider his comments to be "protected speech."  *See id.*  And, to the extent Lurch seeks to raise a First Amendment retaliation claim—that is, that he was involuntarily committed by a public official on the basis of his protected speech—Lurch has provided no evidence that "his speech was constitutionally protected," or that "there was a causal relationship between the protected speech and the adverse action," as required to make such a claim. *See Williams v. Temple*, 349 F. App'x. 594, 596 (2d Cir. 2009).  This argument, therefore, has no merit.

[4] Lurch notes that his medical records from Bellevue contain some inconsistencies and inaccuracies—for instance, Inose erroneously described him as an "NYPD prisoner," even though Lurch was not under arrest at the time, Medical Records at 31; and elsewhere, Lurch's "source of referral" is described as "self, family, or friend," *id.* at 35, even though Lurch was brought in by the EMTs and held involuntarily.  However, Chaput's notes specifically state that Lurch "is not in [police] custody" and that he was brought to Bellevue by the EMTs.  *E.g.*, Medical Records at 40.  There is no basis to conclude, therefore, that Chaput's findings were influenced by inaccuracies or erroneous statements elsewhere in Lurch's medical records.

hours," if the examining physician "determines that such person may have a mental illness for which immediate observation, care, and treatment . . . is appropriate, and which is likely to result in serious harm to the person or others."  MHL § 9.40(b).  The patient must be released within twenty-four hours unless two psychiatrists determine the person is mentally ill and poses a danger to himself or others.  *Id.* § 9.40(c); *see also Drozdik*, 2003 WL 366639, at *3.  Admission beyond the initial twenty-four-hour period requires the patient to be given written notice and an opportunity for a hearing.  MHL § 9.40(c).  "Where each of the relevant provisions of [the MHL] have been followed, there is no procedural due process violation" in an involuntary hospitalization.  *Matthews v. City of New York*, No. 15 Civ. 2311, 2016 WL 5793414, at *7 (S.D.N.Y. Sept. 30, 2016) (citation and alterations omitted).  Defendants argue that Chaput fully complied with the MHL in making her determination to confine Lurch.  Defs. Mem. at 16.  The Court agrees.

Lurch argues—without citing any evidence—that Chaput "never conducted an examination" of him, and thus, her decision to involuntarily hold him pursuant to § 9.40 was procedurally defective.  Pl. Opp'n at 4.  But, again, Lurch has not adduced any admissible evidence that supports this assertion.  Lurch's medical records, Chaput's testimony, and her contemporaneous treatment notes all indicate that Chaput evaluated Lurch within six hours of his admission to Bellevue.  Medical Records at 32, 43; Chaput Aff. ¶¶ 11, 19.  Based on her evaluation, Chaput preliminarily diagnosed Lurch with multiple mental illnesses, including a psychotic disorder, and concluded he posed an "acute risk of harm to others given recent violence, [and his] agitation at arrival."  Medical Records at 43; Chaput Aff. ¶ 20.  Chaput determined Lurch should be re-assessed when he could cooperate with a full psychiatric evaluation, Medical Records at 43, and the following morning, after a reassessment by a second

psychiatrist, Lurch was released well within twenty-four hours of his initial admission, *id.* at 52–53.  The MHL does not obligate a physician to provide a patient with written notice or a hearing under § 9.40, as it requires for involuntary commitments of greater duration.  *See, e.g.*, MHL § 9.39(b) (requiring notice and opportunity for hearing to involuntarily commit patient beyond fifteen days).  And, to the extent Lurch may be arguing that Chaput's evaluation was too brief or limited to constitute a sufficient examination under the MHL, he produces no expert testimony or other evidence in support of this contention.  The Court finds, therefore, that Lurch has failed to raise any genuine issues of material fact as to his procedural due process claim.

B.  Fourth Amendment

Involuntary hospitalization implicates an individual's Fourth Amendment protections against unreasonable seizures.  *Glass*, 984 F.2d at 58.  An involuntary hospitalization passes scrutiny under the Fourth Amendment, however, "if it is based upon probable cause, meaning that there are reasonable grounds for believing that the person seized is dangerous to [himself] or others."  *Fisk*, 501 F. Supp. 2d at 526 (citation and quotation marks omitted).  The Fourth Amendment requires only a "probability or substantial chance of dangerous behavior, not an actual showing of such behavior."  *Vallen v. Connelly*, No. 99 Civ. 9947, 2004 WL 555698, at *8 (S.D.N.Y. Mar. 19, 2004) (citing *Illinois v. Gates*, 462 U.S. 213, 245 n.13 (1983)) (quotation marks omitted).

As detailed, the MHL requires a physician to find that an individual has a "mental illness . . . that is likely to result in serious harm to the person or others," before the physician may confine that individual against his will.  MHL § 9.40(b).  Chaput made such a finding, based both on her direct observations of Lurch's behavior and the information she was provided by the EMTs and NYPD officers at the scene and her triage team.  Medical Records at 43; Chaput Aff.

¶¶ 11–15, 20.  Lurch has not adduced any competent evidence suggesting that this conclusion was erroneous or substantially below accepted standards of professional judgment—indeed, Lurch admits to at least some combative behavior and verbal abuse at Bellevue.  Lurch Tr. at 164–66, 175.  The Court finds, therefore, that Chaput had "reasonable grounds" to believe Lurch posed a danger to himself and others, and thus, there was probable cause for his involuntary confinement.  *See Drozdik*, 2003 WL 366639, at *5.  Thus, Lurch cannot prevail on a claim for violation of his Fourth Amendment rights stemming from his confinement.[5]

The Court finds, therefore, that Lurch has failed to demonstrate any genuine dispute of material fact on his involuntary commitment claim.  Defendants' motion for summary judgment on this claim is, accordingly, GRANTED.

## III.   Forced Administration of Medication

Lurch challenges Defendants' decision to medicate him with Haldol over his objection, arguing that because his hospitalization was a "non-emergency situation" he should not have been medicated without a judicial hearing.  Third Am. Compl. at 21.  Psychiatric patients have a "significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment," and thus Lurch states a claim for violation of his due process rights against both Chaput, who ordered the medication, and

---

[5] Lurch titles his involuntary confinement claim "false arrest," which is a separate cause of action.  Third Am. Compl. at 29.  "A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures . . . is substantially the same as a claim for false arrest under New York law." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996).  And, under New York law, to establish a claim for false arrest, a plaintiff must show that: "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Savino v. City of New York*, 331 F.3d 63, 75 (2d Cir. 2003).  But, as with Fourth Amendment involuntary confinement claims, probable cause is a complete defense to a claim of false arrest, *Williams v. Town of Greenburgh*, 535 F.3d 71, 78–79 (2d Cir. 2008), and probable cause exists where "there are reasonable grounds for believing that the person seized is subject to seizure under the governing legal standard," here, the MHL, *Glass*, 984 F.2d at 58 (citation omitted).  Because the Court finds that Chaput had probable cause and reasonable grounds for concluding that Lurch was subject to seizure under the governing legal standard, and because Lurch has not adduced evidence demonstrating that this determination fell substantially below accepted medical standards, Lurch cannot prevail on a claim of false arrest.  *Kraft v. City of New York*, 696 F. Supp. 2d 403, 415–16 (S.D.N.Y. 2010).

Marquez, who administered it. *Washington v. Harper*, 494 U.S. 210, 221–22 (1990).

Defendants argue that Chaput's decision to give Lurch Haldol over his objection was justified by

the threat of harm he posed, Defs. Mem. at 21, and complied with New York state law, which

permits medication of patients over their objection "where the patient is presently dangerous and

the proposed treatment is the most appropriate, reasonably available means of reducing that

dangerousness," *id.* (citing 14 N.Y. Comp. Codes R. & Regs. § 527.8(c)(1)).

   The right to avoid the administration of medication is not absolute, and it is "well-settled

that a patient's liberty interest in not being involuntarily medicated is overridden in an

emergency, where failure to medicate forcibly would result in a substantial likelihood of physical

harm to that patient, other patients, or to staff members of the institution." *Odom v. Bellevue

Hosp. Ctr.*, No. 93 Civ. 2794, 1994 WL 323666 at *3 (S.D.N.Y. July 5, 1994); *see also Rivers v.

Katz*, 504 N.Y.S.2d 74, 80 (N.Y. Ct. App. 1986) (finding that where "the patient presents a

danger to himself or other[s] . . . or engages in dangerous or potentially destructive conduct

within the institution," administration of anti-psychotic medication over the patient's objection

may be warranted). In line with this constitutional standard, New York law permits psychiatric

hospitals like Bellevue to "give treatment," including medication, "regardless of admission status

or objection, where the patient is presently dangerous and the proposed treatment is the most

appropriately reasonably available means of reducing that dangerousness." 14 N.Y. Comp.

Codes R. & Regs. § 527.8(c)(1). Such treatment may continue "only as long as necessary to

prevent dangerous behavior." *Id.* § 527.8(c)(1). Administration of medication in compliance

with these conditions "does not amount to a due process violation." *Doe v. Dyett*, No. 84 Civ.

6251, 1993 WL 378867, at *3 (S.D.N.Y. Sept. 24, 1993) (collecting cases); *see also Harper*, 494

U.S. at 211.

A patient is "dangerous" if he "engages in conduct or is imminently likely to engage in conduct posing a risk of physical harm to himself or others."  14 N.Y. Comp. Codes R. & Regs. § 527.8(a)(4).  "Determining if an emergency justifies forced medication is a professional judgment-call[,] balancing the institution's safety concerns against the inmate's interest in remaining free from unwanted medication."  *Dyett*, 1993 WL 378867, at *3 (citing *Bee v. Greaves*, 744 F.2d 1387, 1396 (10th Cir. 1984)) (quotation marks omitted).  Due process does not "require a guarantee that a physician's assessment of the likelihood of serious harm be correct."  *Rodriguez*, 72 F. 3d at 1062.  And, as with claims of involuntary confinement, a doctor's medication decisions are "presumptively valid"—a medical professional will only be held liable under § 1983 where a plaintiff adduces evidence demonstrating that such decisions represent "such a substantial departure from accepted professional judgment, practice, or standards," that it must be concluded the doctor "actually did not base the decision on such a judgment."  *Youngberg*, 457 U.S. at 323; *see also Kulak v. City of New York*, 88 F.3d 63, 75 (2d Cir. 1996).  Therefore, a physician's decision to medicate a patient comports with both substantive and procedural due process where the patient could be "considered imminently likely to engage in conduct posing a risk of physical harm to himself or others"  *See Kulak*, 88 F.3d at 74–75 (quotation marks omitted); *see also Fisk*, 501 F. Supp. 2d at 525.

As detailed above, the record establishes that Chaput had a reasonable basis for concluding that Lurch was presently dangerous.  *See* Chaput Aff. ¶¶ 8, 11; Medical Records at 40, 43; Lurch Tr. at 164–66, 175.  In addition, Chaput attests that because the NYPD cannot remain with a patient who is not under arrest for an extended period, she determined it was necessary to sedate Lurch before removing his handcuffs and applying the hospital's restraints, given the "imminent threat of serious harm" he posed.  Chaput Aff. ¶¶ 12–14.  Chaput and her

team employed less restrictive options to deescalate the situation, including attempting to redirect Lurch from the focus of his anger, increasing observation on him, and asking him to calm down.  Medical Records at 2, Chaput Aff. ¶¶ 11–12.  Chaput also considered—but decided against—administering oral medications, given that Lurch was "completely uncooperative" with her instructions, and because oral medications take longer to be effective.  Chaput Aff. ¶¶ 15–16.  Accordingly, Chaput states that, in her professional judgment, the mild dose of Haldol administered to Lurch was the "most appropriate, reasonably available means of reducing the danger" he posed.  *Id.* ¶¶ 15–17.  And, Defendants' expert, Fayer, similarly agrees that Chaput "properly administered . . . medications after being advised of Mr. Lurch's aggressive and violent behavior, and witnessing it with her own eyes," and that this decision does not represent a significant deviation from accepted professional judgment in the field.  Fayer Decl. ¶ 29.

Chaput's professional judgment is entitled to a presumption of validity, and again, Lurch "fails to offer any evidence that [Chaput's] diagnoses, actions, and subsequent determinations . . . fell substantially below accepted medical standards."  *Kraft v. City of New York*, 696 F. Supp. 2d 403, 415 (S.D.N.Y. 2010); *see also Fisk*, 501 F. Supp. 2d at 525 (granting summary judgment where plaintiff "offered no evidence to support a claim that the defendants' decision to medicate her against her will deviated from accepted medical standards").  Thus, the Court finds that Chaput's "decision to administer a low-level dose of Haldol . . . was a proper exercise of [her] professional judgment and comported with the requirements of § 527.8(c)(1)."  *Kulak*, 88 F.3d at 74.

Lurch relies on *Brandt v. Monte*, 626 F. Supp. 2d 469 (D.N.J. 2009), to argue that because he did not legitimately present a danger, Defendants were not justified in using § 527.8's emergency procedures to medicate him—rather, he should have received a judicial hearing

beforehand.  Pl. Opp'n at 5.  Lurch argues, in essence, that there is a genuine dispute of material

fact as to whether his behavior was sufficiently dangerous to justify involuntary medication.  In

*Brandt*, a district court in New Jersey found that there was a triable issue of material fact as to

whether the plaintiff "presented a legitimate danger" that justified medicating him against his

will.  626 F. Supp. 2d at 479.  But, the court based this holding on a finding that the plaintiff had

set forth "specific facts" to dispute the defendants' assertions that he posed a danger, including

deposition testimony from hospital employees that the hospital routinely used emergency

procedures pretextually to medicate patients who refused to consent to treatment; and expert

testimony that the hospital's emergency procedure was "coercive," and that the decision to

medicate the plaintiff "was a substantial departure from accepted professional standards."  *Id.*

By contrast, Lurch provides no evidence beyond his own inconsistent deposition testimony

showing he posed no danger on the night in question, and he makes "no attempt . . . to square

[his] own . . . subjective testimony with the hard evidence adduced during discovery," which is,

by itself, "insufficient to defeat summary judgment."  *Deebs v. Alston Transp., Inc.*, 346 F.

App'x 654, 656 (2d Cir. 2009).

Lurch also argues that Chaput administered Haldol to him even after he allegedly told her

he was allergic to the medication.  Third Am. Compl. at 13; Pl. Opp'n at 5.  At least one other

court has noted that a doctor's prescription of anti-psychotic medication "without first

conducting a medical evaluation" of the patient or considering his medical history may be a

"substantial departure from generally accepted standards of medical care."  *See Mejía v. N.Y.C.*

*Health & Hosps. Corp.*, No. 16 Civ. 9706, 2018 WL 3442977, at *10 (S.D.N.Y. Jul. 17, 2018)

(quotation marks).  But, the Court finds "nothing in the record to support [Lurch's] allegations

other than [Lurch's] own contradictory and incomplete testimony," which does not give rise to a

dispute as to a material fact. *Jeffreys v. City of New York*, 426 F.3d 549, 554–55 (2d Cir. 2005).

For instance, although Lurch claims that he told "the admitting psyche" not to give him

Haldol due to his allergy, he could not remember the doctor's name, provide her race, or recall

any identifying features—giving the Court little basis to conclude he communicated this

information to Chaput directly.  Lurch Tr. at 167, 190–91.  Similarly, Lurch admitted in his

deposition that he had drunk at least six to eight shots of vodka prior to being hospitalized, *id.* at

122, and stated that he "forgot this event even happened" and that he "would have never even

remembered this incident," let alone his being given Haldol, if he had not reviewed his Bellevue

medical records several months later, *id.* at 133–36.  This belies his claims that he was cognizant

of, and protested the administration of the Haldol at the time, or that he accurately recalls

conversations with medical staff regarding his alleged allergy.  And finally, although Lurch

states that he "passed out" when he received the Haldol, his testimony is contradictory as to

whether this occurred before or after he received the Haldol, giving the Court no basis to

conclude this was a consequence of the drug.  *Compare id.* at 176 ("[B]efore it was even injected

in my skin, I passed out by panic"), *with id.* ("I passed out as soon as the needle touched my

skin.").  And, Lurch does not identify any other adverse reactions or effects from the Haldol, *id.*

at 182–83, and his medical records state that no such reaction occurred, Medical Records at 52–

53.[6]  Given these inconsistencies and contradictions, and given the absence of any corroborating

---

[6] Even if the Court construed Lurch's allegations as a state-law medical malpractice claim, his claims would not
survive summary judgment.  Under New York law, to prevail on a medical malpractice claim, a plaintiff must show
"(1) a deviation or departure from accepted practice, and (2) evidence that such departure was a proximate cause of
injury or damage."  *Torres v. City of New York*, 154 F. Supp. 2d 814, 819 (S.D.N.Y. 2001).  That is, a plaintiff must
"specify the injuries he suffered and allege sufficient facts to demonstrate how his injuries were caused by a
deviation from the standard of care."  *Isaac v. City of New York*, No. 17 Civ. 1021, 2018 WL 1322196, at *8
(S.D.N.Y. Mar. 13, 2018).  And, as with federal § 1983 claims for substantive due process violations, plaintiffs must
generally produce expert testimony to make a prima facie case of medical malpractice under state law.  *E.g.*, *Sitts v.
United States*, 811 F.2d 736, 740 (2d Cir. 1987) (noting "in the view of the New York courts, the medical

evidence in the record, no reasonable trier of fact "would undertake the suspension of disbelief

necessary" to return a verdict in Lurch's favor.  *Jeffreys*, 426 F.3d at 554–55.  Thus, summary

judgment is appropriate.

The Court finds that Lurch has failed to show a triable issue of material fact as to whether

Chaput's decision to medicate him over his objection constituted a substantial departure from

accepted standards of professional judgment.  And, because the Court finds no basis to impute

liability to Chaput, liability may not attach to Marquez for following Chaput's orders and

administering the medication to Lurch.  *See Douglas v. Stanwick*, 93 F. Supp. 2d 320, 326

(W.D.N.Y. 2000) (declining to impute liability to nurse for complying with supervising doctor's

reasonable instructions); *Roy v. Alicia*, No. 19 Civ. 585, 2021 WL 966010, at *6 (N.D.N.Y. Feb.

3, 2021).  Accordingly, Defendants' motion for summary judgment on Lurch's forced

medication claim is GRANTED.

## IV.   Improper Use of Restraints

Finally, Lurch alleges that Chaput ordered restraints to "assist her in forcibly medicating"

him "in a non-emergency situation," where he posed no risk of imminent danger—thus violating

his due process rights under the Fourteenth Amendment.  Third Am. Compl. at 13–14.  Due

process protects a patient's right to freedom of bodily movement, and this right is breached when

"a patient is bodily restrained except pursuant to an appropriate exercise of judgment from a

health professional."  *Lombardo v. Stone*, No. 99 Civ. 4603, 2001 WL 940559, at *11 (S.D.N.Y.

Aug. 20, 2001) (citing *Wells v. Franzen*, 777 F.2d 1258, 1261–62 (7th Cir. 1985)).  Accordingly,

---

malpractice case in which no expert medical testimony is required is rare" (quotation marks omitted)).  But, as
discussed, Lurch adduces no expert testimony to demonstrate that Chaput's actions represented a deviation or
departure from accepted practice, nor does he allege that he suffered any injuries or adverse consequences due to the
Haldol.  Even construing his pleadings generously, the Court finds that Lurch cannot prevail on a medical
malpractice claim against Chaput.

"it is the duty of a court to ensure that professional judgment in fact was exercised in the decision to restrain." *Id.* (citing *Wells*, 777 F.2d at 1261–62). The Court, therefore, applies the *Youngberg* standard to determine whether Chaput's decision to order restraints represents a "substantial departure from accepted professional judgment," thus violating Lurch's substantive due process rights. 457 U.S. at 323; *see also Society for Good Will to Retarded Children, Inc.*, 737 F.2d 1239, 1246 (2d Cir. 1984) (applying *Youngberg* standard to claims of undue bodily restraints by residents of state institution).

As with Lurch's other claims, his failure to adduce evidence demonstrating that Chaput's medical judgment fell substantially below professionally accepted standards is fatal to his substantive due process claim. *See Society for Good Will*, 737 F.2d at 1248 (finding that "due process is satisfied if restraints are imposed . . . in accordance with the judgment of qualified professionals."). Lurch arrived at the CPEP in handcuffs, and admits he was "combative" and had to be held down by staff before Chaput ordered restraints, Lurch Tr. 164–66, 175—which is corroborated by the contemporaneous treatment notes of Chaput and multiple members of her team, describing Lurch as "threatening" "agitated," and "yelling and cursing." *E.g.*, Medical Records at 2, 31–32, 36–37, 40. Chaput attests that, because the NYPD officers could not remain in the room and keep Lurch's police handcuffs on while the sedative medication took effect, she determined it was necessary to apply alternative restraints before removing the handcuffs, given the "imminent risk of serious harm" Lurch posed. Chaput Aff. ¶¶ 12–13. And Chaput also puts forth the expert testimony of Fayer, who states that, based on Lurch's behavior at the restaurant and at Bellevue, "[h]e was at high risk for immediate violent and aggressive behavior, putting himself and the staff in jeopardy," making it "entirely appropriate and

necessary" for Chaput to order restraints until further psychiatric evaluation could be conducted. Fayer Decl. ¶ 19.

As to Lurch's procedural due process claim, New York law permits the use of restraints "in accordance with the written order of a physician and selected only when . . . less restrictive measures . . . have been utilized and found to be ineffective to protect the patient from seriously injuring self or others; or . . . in rare instances where the patient's dangerousness is of such immediacy that less restrictive interventions cannot be safely employed."  14 N.Y. Comp. Codes R. & Regs. § 526.4(c)(1).  Comprehensive psychiatric emergency programs like Bellevue must additionally comply with the provisions of MHL § 33.04.  *Id.* at § 526.4(c)(14)(iv).  MHL § 33.04(b) provides that "[r]estraint shall be employed only when necessary to prevent a patient from seriously injuring himself or others," and "[i]t may be applied only if less restrictive techniques have been clinically determined to be inappropriate or insufficient to avoid such injury."  In addition, § 33.04(d) states that "[r]estraint shall be effected only by written order of a physician after a personal examination of the patient except in an emergency situation," and "[t]he order shall set forth the facts justifying the restraint and shall specify the nature of the restraint and any conditions for maintaining the restraint."  Furthermore, § 33.04(f) provides that once the patient is restrained "[a]n assessment of the patient's condition shall be made at least once every thirty minutes" and "[t]he assessment shall be recorded and placed in the patient's file."  Given that the Second Circuit has deemed the MHL "as a whole" to comport with both substantive and procedural due process, where a doctor complies with the MHL's provisions for ordering and applying restraints, there is no procedural due process violation.  *Project Release*, 722 F.2d at 968, 973–74; *see also Esposito v. Quatinez*, 2 F. Supp. 3d 406, 415 n.6 (E.D.N.Y.

2014) (assuming that "the procedural protections afforded in the MHL . . . are what is required here for procedural due process" in the context of an involuntary restraint claim).

Aside from asserting that Chaput's assessment of his dangerousness was erroneous, Lurch proffers no evidence demonstrating that Chaput failed to comply with the MHL in ordering or administering his restraints.  As detailed above, Chaput evaluated Lurch, and made a reasonable medical judgment that restraints were necessary to prevent Lurch from harming himself or Bellevue staff.  As required by MHL § 33.04, Chaput and her team first employed "less restrictive techniques," and determined these methods were insufficient.  Medical Records at 2; Chaput Aff. ¶ 11.  Chaput then entered a written order for restraints that characterized Lurch's behavior as "agitated" and "threatening" and described him as "unable to cooperate." Medical Records at 2.  The report also specified the type of restraint to be imposed, and the duration of, and conditions for maintaining the restraint.  *Id.*  After the restraints were applied, Clemente evaluated Lurch at approximately fifteen-minute intervals, and recorded her assessment of his condition.  *Id.* at 4.  Clemente removed the restraints roughly half an hour after their initial application when Lurch fell asleep.  *Id.* at 4.  Chaput's actions—and those of her team—comply with the requirements of the MHL, and Lurch does not provide any competent evidence to the contrary.

The Court finds, therefore, that Lurch has failed to raise a genuine dispute of material fact as to whether Chaput's order and administration of restraints violated his due process rights, and accordingly, Defendants' motion for summary judgment on Lurch's involuntary restraints claim is GRANTED.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED.

The Clerk of Court is directed to terminate all pending motions, close the case, and mail a copy of this order and all unpublished decisions cited therein to Plaintiff *pro se*.

SO ORDERED.

Dated: March 25, 2022
      New York, New York

_____
ANALISA TORRES
United States District Judge